**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 08-CR-728 |
| ) | Judge Joan H. Lefkow |
| VICTOR GUZMAN-CORNEJO. ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

Defendant, Victor Guzman-Cornejo, has been indicted on four counts: (1) one charge of illegally reentering the United States after having been previously deported and removed in violation of 8 U.S.C. § 1326(a) and 6 U.S.C. § 202(4); (2) one charge of knowingly possessing a firearm having previously been convicted of a felony in violation of 18 U.S.C. § 922(g)(1); (3) one charge of knowingly possessing a firearm while being an illegal alien in violation of 18 U.S.C. § 922(g)(5)(A); and (4) one charge of knowingly and intentionally possessing cocaine with intent to distribute in violation of 21 U.S.C. § 841(a). The second, third and fourth counts of the indictment are based on evidence seized during a July 30, 2007 search of defendant's apartment. On January 5, 2009, defendant moved to suppress the evidence discovered during that search and requested an evidentiary hearing to determine whether the it was within plain view. Defendant submitted an affidavit in support of his motion stating that the night stand drawer from which the evidence was seized was closed at the time of the search. Ruling that the evidence would not have been within plain view and would therefore be excludable if the facts

1

asserted by defendant were believed, this court granted the request for the evidentiary hearing. The evidentiary hearing was held on April 7, 2009. For the reasons stated below, the defendant's motion to suppress [#17] is granted.

## **FINDINGS OF FACT**[1]

**A.     Introduction**

On July 30, 2007, a special response team of at least 12 deputy United States marshals and police officers was attempting to locate the defendant to execute an arrest warrant issued for violations of his supervised release. Kruchten obtained the assistance of the Joliet Police Department because he knew defendant to have been arrested in possession of a handgun and Joliet officers were "familiar with" the defendant. At a last known address on North Gage Street in Joliet, Illinois, Deputy United States Marshal Frank Kruchten ("Kruchten") questioned the defendant's ex-wife, Tracy (formerly Guzman) Bernal ("Bernal"). Bernal initially denied knowledge of the defendant's whereabouts but eventually took Kruchten to the defendant's current apartment on Clement Street, also in Joliet. When the team arrived at the Clement Street address, Kruchten knocked and announced their presence but after no one answered and he heard movement,[2] Kruchten and other members of the team entered the apartment.[3] Kruchten went

---

[1] The facts, unless otherwise indicated, are either undisputed or the court's findings of fact based on the weight of the evidence presented during the hearing.

[2] Although Kruchten testified he heard movement, no person or animal was found in the apartment. Kruchten testified that he later discovered "two pit bulls in a cage right outside and adjacent to the house," to which he attributed the movement. Tr. at 18.

[3] Kruchten testified that the team entered through an unlocked door. The defendant testified that the door was locked. Defendant has not challenged the lawfulness of the officers' entry into the apartment.

2

into a bedroom, which contained several pieces of furniture, including a dresser, a chair, a TV on a stand, and a small night stand. The appearance of the night stand and its contents is the critical issue in dispute for the purposes of this motion.

> 1. **The Night Stand**

The night stand was received (rather, is hereby received) in evidence (it was not offered but used by both parties). It is approximately two feet tall and 16" wide by 14" deep at the table surface. The drawer of the night stand appeared to be about six inches high, 12 inches wide and 10" to 12" deep. The court observed the appearance of the night stand with the drawer open three to four inches. In addition, counsel for defendant introduced Exhibit 8, a photograph of the night stand taken during a warranted search later that day. The photograph shows a Glad-brand sandwich bag box on top of the night stand containing opaque plastic bags, a large Folgers coffee container, a Windex glass cleaner bottle, and a cookie tin filled with change and other small items.

> 2. **The Gun**

Kruchten demonstrated to the court how the gun appeared when it was found by placing it back inside the sock and positioning it on the ledge between him and the court as it appeared to Kruchten when he observed it in the night stand. The gun was small (.25 mm, about four inches in length) and fit loosely and completely within about half of the sock. The other half of the sock was folded underneath the gun. The object was flat and ovate.

> 3. **The Drugs**

The narcotics were inside of two layers of plastic bags. The inner bag was the original bag in which the narcotics were found but the outer plastic bag had been changed during the

evidence-gathering process. At this time, the court observed that the original inner bag was sufficiently opaque that one could not observe what was inside it unless it was opened.

## RELEVANT TESTIMONY

**A.    Kruchten's Testimony**

Deputy Kruchten testified that defendant's apartment was sparsely furnished, "not a mess." While walking through the bedroom, he noticed a photo ID of the defendant on the night stand.[4] Kruchten stated that the drawer of the night stand was open three to four inches, such that he could see everything in the front of the drawer. As he was picking up the ID, he noticed two other ID's in the night stand drawer. In addition to the other ID's, he saw a black sack that appeared to him based on his experience in the military and as a law enforcement officer to contain a gun.[5] Although the firearm was completely enclosed within the sack, Kruchten believed the sack contained a firearm because of its shape. He also expected that a gun might be present in the home because of defendant's prior arrest and because Bernal had told him that the defendant had carried firearms in the past and may have a firearm now. He also saw a white rock-like substance and a green leafy substance in separate bags inside a sandwich bag box. In regard to the white rock-like and the green leafy substances, Kruchten testified that based on his training and experience as a law enforcement officer, it was apparent they were narcotics.

---

[4] This identification directed the marshals to the defendant's place of work, where he was later arrested without incident.

[5] Upon securing the firearm, Kruchten discovered that it was wrapped in a black sock.

## B. Defendant's Testimony

Defendant testified that before leaving for work with his son on the morning of July 30, he closed the night stand drawer. Defendant described himself as a very neat and organized person. He testified that each day before leaving he made sure his apartment was neat and that all the drawers were closed because his apartment was for sale and was being shown by real estate agents. The defendant testified that he paid particular attention to keeping the night stand drawer closed so that his dogs and children would not have access to its contents. The defendant testified that the plastic bags containing the narcotics were inside a sandwich bag box and covered up with other loose plastic bags. During his testimony, the defendant placed the sandwich bag box and the black sock inside the night stand to indicate their location in the drawer. The defendant indicated that sandwich box was atop the gun in the very back of the drawer.

## C. Testimony of other witnesses

Counsel for the defendant offered three other witnesses who corroborated the defendant's testimony that he was a very neat and organized person who had a practice of keeping all the drawers in his apartment closed, and in particular the night stand drawer. Those witnesses were Bernal, the defendant's ex-wife; Victor Guzman-Cornejo, Jr., son of Bernal and the defendant; and Christina Villafuerte, defendant's girlfriend at the time of the search.

Bernal described defendant as "a very clean, obsessive-type person. Everything had to be perfect." Tr. at 71. Victor testified that his father kept his bedroom "organized and clean, like perfect. It had to be perfect with him." Tr. at 66. On the morning of the search, Victor left

the house before his father, as did Villafuerte. Villafuerte also described defendant as "very tidy, very neat, very clean." Tr. at 81.

Bernal also testified that when the agents and officers came to her home they made her stay in the kitchen on a chair while they went through the house looking for defendant. On cross, she stated that they searched the children's rooms, including opening all the dresser drawers in her son's room.

## **LEGAL STANDARD**

"It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton* v. *New York*, 445 U.S. 573, 586, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980) (internal quotations omitted). Nevertheless, "[t]he plain view doctrine authorizes the warrantless seizure of personal property where the initial intrusion which affords the officers a plain view is lawful . . . . and the incriminating nature of the property is immediately apparent." *Moya* v. *United States of America*, 761 F.2d 322, 326 (7th Cir. 1984) (internal quotations and citations omitted). The Seventh Circuit has stated that the warrantless seizure of an item falls within the plain view exception where (1) the officer was lawfully present in the place from where he viewed the item, (2) the item was in plain view, and (3) its incriminating nature was "immediately apparent," *i.e.*, the government can show probable cause to believe the item is contraband or otherwise linked to criminal activity. *United States* v. *Celliti*, 387 F.3d 618, 623 (7th Cir. 2004); *United States* v. *Raney*, 342 F.3d 551, 558-59 (7th Cir. 2003); *Moya*, 761 F.2d at 326. "Probable cause requires sufficient evidence to lead a reasonable and prudent person to believe, not merely suspect, that a crime has

been or is being committed.  *Moya*, 761 F. 2d at 325 (citing *Brinegar* v. *United States*, 338 U.S. 160, 175-76, 69 S. Ct. 1302, 93 L. Ed. 1879 (1949)).

As the defendant does not contend that Kruchten was not lawfully present in his bedroom, the court assumes that the first requirement is met.

## A. Was the drawer open or closed?

The two witnesses who observed the night stand on the morning of July 30 take directly opposite positions.  Kruchten said the drawer was open and the ID's, the drugs and the gun (in a sock) were all in plain view in the front of the drawer.  Defendant said the drawer was closed, and the drugs were in a box covered with empty plastic bags; the gun was in a sock under the sandwich bag box tucked in the back of the drawer.  Based on the consistent testimony that defendant was a tidy person and the home was "not a mess" when Kruchten entered, that Kruchten was alone in the room and unobserved, that Bernal testified (and Kruchten did not rebut) that Kruchten opened drawers at the Gage Street house, and that the drawer contained a gun and narcotics which a reasonable person would not leave open and exposed to others who might enter the home (such as Victor and Villafuerte, or a real estate agent), it is more likely than not that the drawer was closed and that Kruchten opened it.  Although all of the defendant's witnesses had an obvious motive to testify in favor of defendant, and the court rejects the testimony of defendant insofar as he purported to specifically remember closing the drawer, the court had the opportunity to observe the demeanor of the family witnesses and is persuaded that their testimony was likely truthful.

**B. Was the incriminating nature of the drawer's contents immediately apparent?**

Even if this conclusion is incorrect, however, as it could be, and the drawer was open, in order to rule for the government, the court would have to find that the gun and narcotics were in the very front of the drawer in such a position that it was immediately apparent that they were contraband. For this to be true, the box would have to have been substantially parallel to the face of the night stand with the gun beside it (as well as the two ID's) in order for Kruchten to have a sufficient view to see the items well enough to determine what they were. Defendant's testimony that he had placed illegal items in the back of the drawer is more likely. In either event, the gun was inside in a black sock, such that an ordinary observer would not readily infer that a gun was within. The drugs were inside an opaque plastic bag, inside another plastic bag, likely covered with other loose plastic bags, all of which were contained within the sandwich bag box. It is unlikely that Kruchten would have actually seen any drugs.

The government insists that the incriminating nature of the items was obvious to Kruchten because of his training and experience as a law enforcement officer. As the defendant points out, however, the court must not evaluate whether the incriminating nature of an item is immediately apparent from the viewpoint of a law enforcement officer with extensive training and experience. Rather, the court is required to determine whether "the facts available to the officer would warrant a man of reasonable caution in the belief that certain items may be contraband or stolen property or useful as evidence of a crime." *Texas* v. *Brown*, 460 U.S. 730, 742, 103 S. Ct. 1535, 75 L. Ed 2d 502 (1983) (internal quotations and citations omitted). Even if Kruchten's version of the location of the items is accepted, the court finds that their incriminating nature was not "immediately apparent." There is nothing inherently incriminating

8

about a black sock with a small object inside it or a sandwich bag box containing plastic bags, particularly where the defendant appears to have kept a random assortment of items on his night stand.[6]  While Kruchten's seasoned law enforcement instincts were correct, the court cannot say that a man of reasonable caution who was aware of the facts surrounding the investigation would have believed, rather than suspected, that the items inside the black sock and sandwich bag box were a gun and drugs.

*United States* v. *McLevain*, 310 F.3d 434 (6th Cir. 2002), is instructive.  Gary Cauley was a prisoner and a friend of the defendant, Roger Dale McLevain.  After Cauley failed to return

---

[6] In *Brown*, a plurality of the Court found that the incriminating nature of an opaque tied-off balloon was sufficiently apparent to the officer who had seized it.  In that case, an officer stopped the defendant's car at a routine driver's license checkpoint.  When the officer asked the defendant to produce his license, he saw the defendant withdraw from his pocket an opaque green party balloon which had been knotted about one-half inch from the tip.  The defendant then opened his glove compartment in which the officer saw several small plastic vials, quantities of loose white powder, and an open bag of party balloons.  After the defendant stated that he had no license, the officer instructed the defendant to get out of the car.  He then picked-up the balloon and examined its contents.  Upon determining that it contained narcotics, he seized the balloon and conducted an inventory of the contents of the car.  The officer testified that, based on his experience in previous arrests and from discussions with other officers, he was aware that tied-off balloons were commonly used to package narcotics.
 A plurality of the Justices found that the officer's experience and his prior observation of the contents of the glove compartment gave the officer probable cause to believe that the balloon contained contraband.  The fact that the officer could not see through the opaque balloon was irrelevant because "the distinctive character of the balloon itself spoke volumes as to its contents - - particularly to the trained eye of the officer."  *Id*. at 743.  In his concurring opinion, Justice Stevens further explained the plurality's decision with regard to probable cause, stating that two potential justifications for opening the balloon without a warrant existed.  First, "what the officer saw in the car's glove compartment, coupled with his observation of respondent and the contents of his pockets, provided probable cause to believe that contraband was located somewhere in the car - not merely in the balloon at issue."  *Id*. at 750.  Second, "the balloon could be one of those rare single-purpose containers which 'by their very nature cannot support any reasonable expectation of privacy because their contents can be inferred from their outward appearance.'"  *Id*. (quoting *Arkansas* v. *Sanders*, 442 U.S. 753, 464-65 n. 13, 99 S. Ct. 2586, 61 L. Ed. 2d 235 (1979)).  This case is distinguishable from *Brown* because neither justification applies.  Kruchten has not testified that he observed anything prior to seizing the gun and seeking a warrant for the contents of the opaque plastic bags which led him to believe that the drawer contained contraband.  Moreover, unlike the tied-off balloon in *Brown*, a black sock and opaque plastic bags inside a sandwich bag box are not single purpose containers such that their contents could be readily inferred from their outward appearance.

9

from work release to his detention center, the jailer there sought a search warrant of McLevain's house on the belief that Cauley was there. A state court judge issued a search warrant for McLevain's residence and authorized the seizure of Cauley and McLevain. The officers executing the warrant were aware that McLevain had a criminal record with a narcotics offense. They forcibly entered McLevain's home and seized him. They then began searching for Cauley, who was not found. Underneath the bed, a narcotics detective saw a twist tie and a cut cigarette filter. He suspected these items were drug paraphernalia. Another officer then drew the detective's attention to a spoon with residue on a tackle box in a sink in the garage. The detective field tested the residue and determined it was methamphetamine. About the same time, the detective also noticed an unlabeled prescription bottle filled with clear liquid on the fireplace mantel. The detective identified the four items as drug paraphernalia and used them to establish probable cause for a second search warrant. Upon returning with the second search warrant, the officers discovered 85 grams of methamphetamine, $5,710 in cash and other drug paraphernalia, all of which formed the basis of the charges against McLevain.

McLevain filed a motion to suppress, arguing that none of the four pieces of evidence was immediately incriminating. Because the first warrant only authorized the search and seizure of the two men, the Sixth Circuit analyzed the seized evidence under the plain view exception. The court found that while the detective's presence in McLevain's home was valid, the items seized were not within plain view. It reasoned that "the items found with McLevain's home might be found under beds, in sinks, and on mantels in many homes, and not exclusively those where methamphetamine is being used." *Id*. at 442. The fact that the cut cigarette filter and the prescription bottle may have been out of the ordinary did not authorize the police to seize them.

10

*Id*. The court then ruled that the detective's experience as a law enforcement officer, which led him to connect those items to illegal activities, was not sufficient to render them "intrinsically incriminating." *Id*. Citing to a recent but unpublished Sixth Circuit case, the court reiterated the rule that "when an item appears suspicious to an officer but further investigation is required to establish probable cause as to its association with criminal activity, the item is not immediately incriminating." *Id*. at 443 (citing *United States* v. *Byrd*, No. 98-2275, 2000 U.S. App. LEXIS 7284, at *7 (6th Cir. Apr. 18, 2000)). Accordingly, the court reversed the district court's denial of the motion to suppress.

This case is analogous to *McLevain*. In both cases, the officer was aware of a link between the residence being searched and criminal activity but did not have authority to search the residence for such evidence. Moreover, in both cases, the law enforcement officers who encountered the items at issue testified that it was their training and experience that led them to conclude that the items were linked with criminal activity. Thus, under the rule applied in *McLevain*, the items seized from the defendant's night stand would not fall within the plain view exception. The gun concealed in the black sock and the drugs concealed in an opaque plastic bag, though suspicious in appearance to Kruchten, required further investigation to establish probable cause as to their association with criminal activity. Therefore, their incriminating nature cannot be said to have been immediately apparent.

The court rule in *McLevain* is consistent with the approach in this circuit as set out above. Accordingly, the court finds that the incriminating nature of the items was not immediately apparent and, therefore, that the items seized were not in plain view.

## **CONCLUSION AND ORDER**

For the reasons discussed above, the defendant's motion to suppress [#17] is granted.

Dated: May 26, 2009         Enter: _____
                                    JOAN HUMPHREY LEFKOW
                                    United States District Judge